UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re

       M. FINE LUMBER CO., INC.,

                    Debtor.

-----------------------------------------------------------x

Case No. 07-43529-CEC

Chapter 11

## DECISION

Appearances:

| | |
|---|---|
| Gary B. Sachs, Esq. | Neal M. Rosenbloom, Esq. |
| Hofheimer Gartlir & Gross, LLP | Finkel Goldstein Rosenbloom & Nash, LLP |
| 530 Fifth Avenue | 26 Broadway |
| New York, New York 10036 | New York, New York 10004 |
| Attorneys for Debtor | Attorneys for Peabody Webster Holdings LLC |
| | |
| Clifford A. Katz, Esq. | William E. Curtin, Esq. |
| Platzer Swergold Karlin Levine | 271 Cadman Plaza East |
|   Goldberg & Jaslow, LLP | Suite 4529 |
| 1065 Avenue of the Americas | Brooklyn, New York 11201 |
| New York, New York 10018 | Office of the United States Trustee |
| Attorneys for the Committee of | |
|   Unsecured Creditors | |

Scott H. Rosenblatt, Esq.
Jocelyn Lee Jacobson, Esq.
Reitler Brown & Rosenblatt, LLC
800 Third Avenue
New York, New York 10022
Attorneys for New York Timber

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of M. Fine Lumber Company, Inc. (the "Debtor") to assume its commercial lease with Peabody Webster Holdings LLC (the "Landlord") pursuant to § 365 of Title 11, U.S.C. (the "Bankruptcy Code").  The Landlord objected to the Debtor's assumption of the lease.  For the following reasons, the Debtor's motion is granted, on the condition that, within 10 days after entry of the order granting this motion, the Debtor tenders to the Landlord the full amount due to cure pre-petition defaults under the Lease (including $7,000, on account of attorneys' fees to which the Landlord may be entitled under the lease), together with $50,000 as an additional security deposit.

## Jurisdiction

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(b) and 157 and the Eastern District of New York standing order of reference dated August 28, 1986.  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## Facts

On June 29, 2007, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.   On Schedule G, the Debtor listed a commercial lease with the Landlord for the premises located at 1301 Metropolitan Avenue, Brooklyn, New York (the "Lease") as an executory contract.  The Debtor operates a lumberyard located at the premises subject to the Lease.

On August 2, 2007, the Landlord filed a motion to compel the Debtor to pay post-petition rent and real estate taxes due under the Lease, and to provide proof that it maintains required insurance coverage.

On October 24, 2007, pursuant to § 365(d)(B)(i) of the Bankruptcy Code, the Court extended the Debtor's time to assume or reject executory contracts and unexpired leases to January 25, 2008, which is the 210th day after the date this case was commenced.

On January 9, 2008, the Debtor filed a motion to assume the Lease pursuant to 11 U.S.C. § 365(a) of the Bankruptcy Code. The Debtor asserted that it owed approximately $25,000 in pre-petition rental arrears and $18,500 in post-petition real estate taxes, totaling $43,500. The Landlord argued that the Debtor owes pre-petition rental arrears of $24,961.74, post-petition real estate taxes of $17,929.66, and reimbursement of legal fees incurred by the Landlord of approximately $9,200, totaling $63,891.40. The Landlord estimated that the amount of attorneys fees would increase to $11,000. The Landlord also argued that the Debtor did not provide "adequate assurance of future performance" as required by § 365.

When the Debtor commenced this case, an eviction proceeding was pending due to the Debtor's failure to pay rent. (Tr.[1] at 42.) At the hearing on the Debtor's motion to assume the Lease, the Debtor stipulated that it is not relying on its payment history with the Landlord to show adequate assurance of future performance, and that Debtor's record of payment under the Lease would not support a finding of adequate assurance. (Tr. at 72.) Although the Debtor's principal testified that the company has "about broken even" in Chapter 11, he conceded that the Debtor has accrued post-petition administrative expenses that it cannot currently pay, including $35,000 post-petition payments owed to its workers' union. (Tr. at 41, 42, 44.) On January 17, 2008, the United States Trustee filed a motion to dismiss the case, or alternatively, to convert it to Chapter 7.

---

[1] "Tr." refers to the transcript of the hearing held on January 25, 2008.

On January 25, 2008, the Court held an evidentiary hearing on the Debtor's motion to assume the Lease, during which the Court heard testimony and oral argument. At the hearing, the Debtor tendered checks to the Landlord for $43,000, representing the pre-petition and post petition rental arrears. (Debtor's Exs. 1A, 1B, 1C.) The Landlord accepted the payment for post-petition arrears, but declined to take payment for the pre-petition arrears, reserving the right to receive the cure amounts in the event that the Debtor is permitted to assume the Lease.

## Legal Standard

Section 365(a) of the Bankruptcy Code permits a debtor in possession to assume or reject executory contracts and unexpired leases. 11 U.S.C. § 365(a). Section 365(b) of the Bankruptcy Code provides that if there has been a default under the executory contract or unexpired lease, a debtor in possession may not assume an executory contract or unexpired lease unless it:

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

The purpose of § 365 "is to assist in the debtor's reorganization effort." In re Westview 74th St. Drug Corp., 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986).

A.    <u>Cure of Defaults</u>

    1.    <u>Attorneys' Fees</u>

The Debtor argues that the Landlord is not entitled to recover attorneys fees pursuant to the Lease, and that such amounts should not be included in the amount required to cure the default. The Landlord argues that it entitled to attorneys' fees pursuant to the Lease.

Section 365(b) of the Bankruptcy Code does not provide an independent basis for recovery of attorneys' fees. 11 U.S.C. § 365(b); <u>In re Best Products Co.</u>, 148 B.R. 413, 414 (Bankr. S.D.N.Y. 1992). A landlord is entitled to recover attorneys' fees in connection with lease assumption pursuant to § 365(b) only to the extent provided for in the lease. <u>In re Ames Dep't Stores, Inc.</u>, 306 B.R. 43, 81 (Bankr. S.D.N.Y. 2004); <u>Best Products</u>, 148 B.R. at 414; <u>Westview</u>, 59 B.R. at 756. It has been held that attorneys' fees are not recoverable "[w]here litigated issues involve not basic contract enforcement questions, but issues peculiar to bankruptcy law." <u>Best Products</u>, 148 B.R. at 414. Certainly this would be true in the absence of an attorneys' fees clause in the Lease broad enough to include fees incurred in litigating bankruptcy issues.

The Lease contains two provisions for the reimbursement of fees. Paragraph 20 of the Lease provides, in pertinent part:

> If the Tenant shall at any time be in default hereunder, and if the Landlord shall institute an action or summary proceeding against the Tenant based upon such default, then the Tenant will reimburse the Landlord for the expense of attorneys' fees and disbursements thereby incurred by the Landlord, so far as the same are reasonable in amount.

(Lease at ¶ 20.)

Paragraph 60 of the rider to the Lease provides that the maximum the Landlord may recover for "any such summary proceedings" is $5000. Rider to Lease at ¶ 60. The Lease, therefore, is unambiguous that the Landlord is entitled to recover attorneys' fees and disbursements for any summary proceeding commenced based on the Debtor's default under the Lease.

The Landlord asserts that the fees incurred in compelling the Debtor to perform its obligations under the Lease, as well as the fees incurred in objecting to the Debtor's motion to assume the Lease, are recoverable pursuant to paragraph 20 of the Lease. It is clear that none of these services were rendered in the context of a summary proceeding. The question, therefore, is whether the fees are compensable under the language of paragraph 20, which provides for recovery of attorneys' fees "if the Landlord shall institute an action . . . based upon . . . [Tenant's] default [under the lease]."

Black's Law Dictionary's definition of "action" includes "[a] civil or criminal judicial proceeding." Black's Law Dictionary 31 (8th ed. 2004). The Landlord's motion to compel the Debtor to perform its obligations under the Lease was a judicial proceeding instituted by the Landlord based upon the Debtor's defaults under the Lease. The Landlord is therefore entitled to recover attorneys' fees and costs incurred in connection with the motion.

The Landlord may not recover the attorneys' fees and costs incurred in objecting to the Debtor's motion to assume the Lease. The language of the Lease provides for reimbursement "if the Landlord shall institute" an action. The motion to assume the Lease was instituted by the Debtor, and the Landlord objected to the relief sought. Furthermore, fees and costs were incurred in objecting to the assumption of the Lease largely related to the Landlord's contention

that the Debtor has failed to provide "adequate assurance of future performance," which is not an issue of contract enforcement, but arises solely under bankruptcy law. As such, they are not recoverable under the language of the attorneys' fees clause of the Lease. In re Child World, Inc., 161 B.R. 349, 354 (Bankr. S.D.N.Y. 1993); Best Products, 148 B.R. at 414.

The amount of fees recoverable by the Landlord will be determined at a later hearing. However, for purposes of determining whether the Debtor has provided adequate assurance that the cure amount will be promptly paid, the Court will estimate the fees at $7,000, approximately 75% of the total attorneys' fees claimed by the Landlord prior to the commencement of the hearing on this motion.

2.  Removal of Graffiti

The Landlord argues that the Debtor has defaulted under the Lease because it has not removed graffiti which has been on the premises since December 2007. (Tr. at 74.) The Debtor asserts that it requested graffiti removal pursuant to a New York City program that provides this service free of charge, and anticipates that removal will be completed by early April or late May. (Tr. at 75, 77.) The Landlord argued that graffiti removal is not free under the program and that the Debtor must pay for it.

The Court heard testimony from Constance Cincotta, a member of the Landlord. (Tr. at 67.) She testified that she has had three "tags" of graffiti removed from other premises, and the cost of such removal by a private contractor was $7,500. (Tr. at 80.)

Section 365(b)(1)(A) provides that the debtor must cure, or provide adequate assurance that it will promptly cure any defaults. "Whether a cure is 'prompt' for purposes of

§ 365(b)(1)(A) depends on the facts and circumstances of each case." In re Embers 86th St., Inc., 184 B.R. 892, 900 (Bankr. S.D.N.Y. 1995.)

Here, the Debtor has undertaken that the graffiti will be removed by May, 2007. The Debtor stated that if the graffiti removal is not free of charge, it will pay for the removal from funds which are being made available to the Debtor to pay Lease obligations post-assignment. (Tr. at 76.) Together with the additional security deposit which the Debtor will be required to pay as a condition to assumption of the Lease, this constitutes adequate assurance of prompt cure of this default.

B.      Adequate Assurance of Future Performance Under the Lease

The Debtor argues that it provided adequate assurance of future performance by entering into two separate agreements with third parties. The first of these agreements is with Greystone Business Credit II LLC ("Greystone"), the debtor's post-petition lender (the "Greystone Agreement"). The Greystone agreement provides for an additional $100,000 borrowing facility to be available to the Debtor, to be used for working capital and to provide adequate assurance of future performance under the Lease. (Debtor's Ex. 3.) The Greystone Agreement provides that $53,000 of the advance would be available only to make contractual rent and other payments to the Landlord, and would be disbursed directly to the Landlord upon receipt of notice that rent had not been timely paid. Id. This restricted amount is equal to approximately four monthly rent payments under the Lease (exclusive of taxes).

The monies to be advanced under the Greystone Agreement would be available for a period not greater than six months from the first advance. The availability of the facility is conditioned upon Greystone's receipt of a mortgage on the residence of the Debtor's principal,

8

Louis Fine, which he owns with his wife. <u>Id.</u> Mrs. Fine did not sign the Greystone Agreement, but Mr. Fine offered testimony, obviously hearsay, that she had agreed to provide the mortgage to Greystone and that she had authorized him to sign the Greystone Agreement on her behalf. (Tr. at 26.) The Greystone Agreement is a modification of the Debtor's existing lending facility with Greystone, which provides that the right to borrow terminates upon, among other things, the conversion or dismissal of the case. (Debtor's Financing Mot. (Docket # 34), Ex. A at 20-21, ¶ 7.1.) The Greystone Agreement would also be subject to Bankruptcy Court approval (<u>see</u> 11 U.S.C. § 364).

The second agreement proffered by the Debtor as adequate assurance of future performance under the lease is with New York Timber ("NY Timber"), whose principal is Merritt Fine, the son of the Debtor's principal (the " NY Timber Agreement"). Pursuant to the NY Timber Agreement, NY Timber agrees to guarantee the rental payments under the Lease until the Debtor confirms a Chapter 11 plan of reorganization, the Lease is assigned, or the Debtor's case is converted or dismissed. (Debtor's Ex. 4.) The NY Timber Agreement also provides that NY Timber will deposit in escrow an amount equal to two months of rent under the Lease, "as added assurance of this guarantee." The NY Timber Agreement does not specify exactly how and when the Landlord would be able to draw on these funds; however, the NY Timber Agreement is clear that the escrowed funds would be returned to NY Timber upon conversion or dismissal of the case. <u>Id.</u>

In addition, separate from any amounts that may become available for rent payments under the Greystone Agreement and the NY Timber Agreement, the Landlord holds a security

deposit of $20,000, which equals approximately one and one-half months of rent, not including taxes.

The Debtor also offered expert testimony concerning value of the Lease in support of its contention that it has fulfilled the requirement of § 365(b)(1)(C) to provide adequate assurance of future performance under the Lease. Neil Dolgin is an executive vice president of Kalman Dolgin Inc., a real estate brokerage firm specializing in industrial commercial real estate in the five boroughs of New York City, and holds an M.B.A. concentrating in "real estate and urban development throughout New York City." (Tr. at 13.) He has appraised over 200 properties since 1975 in the past five years. (Tr. at 13-14.) In light of his experience and expertise, and in the absence of objection to his qualifications, Mr. Dolgin was qualified as an expert witness in the field of appraisal of real property. (Tr. at 18.)

Mr. Dolgin testified that the Lease premises is approximately 60,000 square feet, and that the rent under the Lease is approximately $3.18 per square foot, including taxes. (Tr. at 14-15.) He testified that, on a conservative basis, the market rent for the premises is approximately $5 per square foot, including taxes. (Tr. at 18-19.) Mr. Dolgin estimated that the Lease is $1.8 per square foot or $108,000, per year under market. (Tr. at 20-21, 22.) Based on Mr. Dolgin's testimony, therefore, it appears that the Lease is approximately 36% under market. Taken together with the substantial term remaining under the Lease (six years with a ten-year renewal option), the Lease's under-market rent makes it an asset with substantial potential value. (Tr. at 69.)

Mr. Dolgin further testified that the leased premises consists primarily of vacant land, and is located on the border of Queens and Brooklyn, zoned for heavy industrial use. (Tr. at 19-

20.) He testified that it would not be difficult to market the Lease because "there's a very big need for vacant land for these various different companies that have been pushed off their property for the recent redevelopment of other properties in and around the metropolitan area." (Tr. at 20.)  Mr. Dolgin estimated that it would take "in the range of three months" to find another tenant to take over the space and assume the Lease.  (Tr. at 19.)

The Debtor argues that, although its own payment record, both pre and post-petition, is admittedly less than stellar, the combination of Greystone and NY Timber Agreements, together with the Lease's significant market value, provides adequate assurance of future performance. According to the Debtor, within the next six months, either the Debtor, with the assistance of NY Timber, will propose a plan of reorganization to recapitalize the Debtor and place it on a sound financial footing; or, the Lease will be sold to a third party.  (Tr. at 10, 41, 62-64, 72.)  The Debtor contends that the Greystone Agreement and NY Timber Agreement, taken together, provide assurance to the Landlord that the rent will be paid during that six month period, and the inherent value of the Lease, which is 36% below market for vacant industrial use property that is significantly in demand in the New York City metropolitan area, provides adequate assurance that if a plan cannot be confirmed, the Lease will be sold.

The Landlord argues that the Debtor has not provided "adequate assurance of future performance," pointing to the Debtor's undisputed history of failing to timely pay rent under the Lease, both pre-petition and post-petition.  The Landlord contends that the Greystone Agreement and the NY Timber Agreement are insufficient to provide adequate assurance because those agreements expire in six months, and are subject to earlier termination if (among other things) this case is converted or dismissed, while the Lease's term runs for another six years, with a ten

year renewal option. The Landlord also points out that the Greystone Agreement is subject to conditions which were not met at the time of the hearing (such as receiving a mortgage on the principals' residence), and that the NY Timber Agreement's guarantee was unsupported by evidence of NY Timber's ability to perform that guarantee. The Landlord contends that the evidence presented by the Debtor of the Lease's intrinsic value should not be considered in determining whether the debtor has provided adequate assurance of future performance. The Landlord points out that the Debtor has no assignee and is not moving to assign the Lease, and argues that to permit the Debtor to assume the Lease based on evidence of future saleability is tantamount to extending the Debtor's deadline to assume or reject the Lease beyond the 210 day time limit set by § 365(d)(4)(B).

The term "adequate assurance of future performance" is not statutorily defined. Courts have looked to the legislative history to determine its meaning. In re Rachels Indus., Inc., 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); Westview, 59 B.R. at 754; In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985); In re Sapolin Paints, Inc., 5 B.R. 412, 420 (Bankr. E.D.N.Y. 1980). The legislative history indicates that Congress intended to give the term "a practical, pragmatic construction." Sapolin Paints, 5 B.R. at 420. Whether "adequate assurance of future performance" has been provided is determined by the facts and circumstances of each case. In re Texas Health Ents., Inc., 72 Fed. Appx. 122, 126 (5th Cir. 2003); In re Gen. Oil Distribs., Inc., 18 B.R. 654, 658 (Bankr. E.D.N.Y. 1982); Chera v. 991 Blvd. Realty Corp. (In re Nat'l Shoes, Inc.), 20 B.R. 55, 59 (Bankr. S.D.N.Y. 1982); In re Lafayette Radio Elecs. Corp., 9 B.R. 993, 998 (Bankr. E.D.N.Y. 1981). A debtor need not prove that it will "thrive and make a profit," Natco, 54 B.R. at 440, or provide "an absolute guarantee of performance," In re Silent

Partner, Inc., 119 B.R. 95, 98 (E.D. La. 1990).  It must simply "appear[] that the rent will be paid and other lease obligations met."  Westview, 59 B.R. at 755.  As one court stated:

> The emphasis is on protection.  Section 365 gives no indication
> that a landlord . . . is to improve its position upon the bankruptcy
> of a tenant.  The statute affords no relief to a landlord simply
> because it might have the opportunity to rent the premises to others
> at a higher base or percentage rent and would otherwise seek to
> escape the bargain it made.

Natco, 54 B.R. at 441 (citing In re Webster Clothes, Inc., 36 B.R. 260, 264 (Bankr. D. Md. 1984).  In determining whether "adequate assurance of future performance" has been shown, courts have considered some of the following factors:

   (1) the debtor's payment history;

   (2) presence of a guarantee;

   (3) presence of a security deposit;

   (4) evidence of profitability;

   (5) a plan which would earmark money exclusively for the landlord;

   (6) the general outlook in the debtor's industry; and

   (7) whether the unexpired lease is at, or below, the prevailing rate.

See In re Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1310 (5th Cir. 1985); Embers, 184 B.R. at 902; Westview, 59 B.R. at 755; Natco, 54 B.R. at 440; Sapolin Paints, 5 B.R. at 421.

Courts have found adequate assurance of future performance in a number of different factual situations. See Westview, 59 B.R. at 755 (increase of sales, reduction of operating expenses, and two months' security); Lafayette Radio, 9 B.R. at 1000 (court previously held that debtor's sublease program, together with a proposed merger, provided adequate assurance; court further found that proposed sublessee had a likelihood of success, value of sublease to debtor, $10,000 security deposit, and $10,000 promissory note was sufficient); Sapolin Paints, 5 B.R. at 421 (below-market lease furnished adequate assurance). See also In re Ames Dep't Stores, 348 B.R. 91, 98 (Bankr. S.D.N.Y. 2006) (stating that, with respect to assumption and assignment of leases in bankruptcy, "Congress has determined that the economic value in below market leases is to go to creditor bodies generally, and not to a windfall for a single creditor"). The debtor bears the burden of showing that the requirements for assumption under § 365 have been met. Embers, 184 B.R. at 902; Rachels Indus., 109 B.R. at 802.

The Landlord contends that the market value and saleability of the Lease cannot be taken into consideration in determining whether adequate assurance of future performance has been shown. This Court disagrees. Nothing in § 365(b), or in the case law interpreting it, so restricts the evidence which may be considered in this regard. To the contrary, courts have expressly found the market value of a lease to be a factor providing adequate assurance of future performance. See In re Serv. Merch. Co., 297 B.R. 675, 683 (Bankr. M.D. Tenn. 2002) (considering value of below market lease in the context of adequate assurance under 11 U.S.C. § 365(b)(3)); In re Rickel Home Ctrs., Inc., 240 B.R. 826, 835 (D. Del. 1998) (considering the value of below market lease in the context of adequate assurance under 11 U.S.C. § 365(b)(3)); Sapolin Paints, 5 B.R. at 421. In Sapolin Paints, for example, the court held noted that the rent

under the lease in question was significantly below market, and found that this "economic condition . . . [provides] protection against the possibility that [the] property will be vacated and abandoned sometime in the indefinite future . . . ." Sapolin Paints, 5 B.R. at 421. Accord, Lafayette Radio, 9 B.R. at 1000.

Based upon Mr. Dolgin's testimony that the rent under the Lease is approximately 36% below market, and that there is a high demand for vacant land such as the leased premises in New York City for industrial use, it appears likely that the Debtor, or a trustee, if the case is converted to Chapter 7, would be successful in finding a buyer for the Lease. It should be noted that the Lease contains no restrictive use clause which, if enforceable in this bankruptcy case, would limit the type of commercial or industrial tenant to which the Lease could be marketed.

The Landlord's contention that to find adequate assurance of future performance based upon evidence of the Lease's market value amounts to a *sub rosa* extension of the Debtor's time to assume the Lease, in violation of § 365(d)(4)(B)(ii), must be rejected. Section 365(d)(4) sets a deadline for the assumption of a lease in order to limit the period during which a lessor may be kept in "limbo," with a lease that has not been assumed or rejected. During that time, the landlord does not know whether the lease will be assumed, and pre-petition defaults cured, or whether it will be rejected, leaving the landlord with an unsecured claim for pre-petition arrears and with vacant space to be re-let. During this "limbo" period, which, prior to the 2005 amendments to the Bankruptcy Code, often extended for years, the landlord may be forced to forego opportunities to rent the space to desirable substitute tenants, and the rental market may turn against the lessor.

To alleviate the effect of this uncertainty, the 2005 amendments to the Bankruptcy Code imposed a firm deadline for lease assumption, which the Debtor has met. Allowing the Debtor to assume the Lease based upon the showing made here is not equivalent to extending that deadline. The Landlord will receive all the benefits of lease assumption: defaults will be cured, and if the lease is subsequently rejected, the landlord will be entitled to an administrative expense claim to the extent provided by § 503(b)(7). The Landlord may disagree with this Court's factual finding that adequate evidence has been presented that future obligations under the Lease will be performed, but that does not place the Landlord in the same position as if the Lease had not been assumed or rejected.

The question remaining is whether the Debtor has shown that there is adequate assurance of future performance of the Lease obligations in the immediate future, until a plan is confirmed or a buyer is found for the Lease. The Landlord argues that the assurance of payment provided by the Greystone Agreement and the NY Timber Agreement is illusory. The Greystone Agreement is subject to conditions, such as Greystone obtaining a mortgage on the Fines' residence, which have not been met; Mrs. Fine, whose consent would be necessary, neither signed the Greystone Agreement nor testified, and no updated title search has been performed to determine whether, for example, there are other liens on the residence that might lead Greystone to conclude that there is insufficient equity in the Fines' residence to support an additional $300,000 advance.

With respect to the NY Timber Agreement, the Landlord points out that no evidence has been presented of the ability of NY Timber to perform under the guarantee, and that under the

16

guarantee, including the escrowed two months of rent securing the guarantee, terminates if this case is converted or dismissed.

These are valid objections to the Debtor's proffer of the Greystone Agreement and NY Timber Agreement as adequate assurance of future performance. The U.S. Trustee has moved to convert or dismiss this case, based upon, among other things, the Debtor's failure to remain current with post-petition obligations. Given the Debtor's track record in this case, there is no guarantee that this case will not be converted in the near future.[2]

Therefore, in order to provide adequate assurance of future performance, the Debtor must provide the Landlord with a sufficient security deposit to insure that, if the case is converted, the Landlord will receive rent payments while the trustee finds a buyer for the Lease. In light of Mr. Dolgin's testimony that a buyer for the Lease could be found "in the range of" three months, a security deposit equal to four months' rent, plus the taxes which will become due in July (which is within the four month period) is adequate. Monthly rent payments are approximately $13,000, and the real estate tax bill due in January was approximately $18,000. Given that the Landlord holds a security deposit of $20,000, the amount that would be required as an additional security deposit to provide adequate assurance of future performance is $50,000.

---

[2] Because the Lease is a valuable asset, if it is assumed, it is unlikely that the case would be dismissed.

17

## Conclusion

For all of the foregoing reasons, the Debtor's motion to assume the Lease is granted, conditioned upon the Debtor paying the following amounts to the Landlord, within ten days after the entry of this Court's order authorizing assumption of the Lease:

      (1)    $24,961.74, representing pre-petition rental arrears;

      (2)    $50,000, as an additional security deposit; and

      (3)    $7,000, on account of attorneys' fees due under the Lease.

The latter amount is to be held by the Landlord's counsel pending determination of the amount of attorneys' fees owed, which will be set down for a hearing.

A separate order will be issued herewith.

Dated: Brooklyn, New York
       March 12, 2008

                                    *s/Carla E. Craig*
                                    CARLA E. CRAIG
                                    Chief United States Bankruptcy Judge